**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | |
|---|---|
| KEVIN MCCALL, | Case No.: |
| Plaintiff, | |
| vs. | **COMPLAINT AND DEMAND FOR JURY TRIAL** |
| HIRERIGHT, LLC, | **FCRA, 15 U.S.C. § 1681** *et seq.* |
| Defendant. | |

Plaintiff Kevin McCall ("Plaintiff" or "Mr. McCall") by and through his counsel brings the following Complaint against defendant HireRight, LLC ("HireRight" or "Defendant") for violations of the federal Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681, *et seq.*, arising out of an employment background check report that Defendant published to Plaintiff's potential employer, which inaccurately published an expunged criminal record concerning Plaintiff. In reality, that criminal record had been expunged.

## INTRODUCTION

1. This is an individual action for damages costs, and attorney's fees brought against Defendant pursuant to the Fair Credit Reporting Act, 15 U.S.C. §§ 1681, *et seq.* ("FCRA").

2. Defendant is a consumer reporting agency that compiles and maintains files on consumers on a nationwide basis. It sells consumer reports generated from its database and furnishes these consumer reports to employers who use the reports to make decisions regarding whether to offer employment to certain consumers.

1

3. Defendant inaccurately reported to Plaintiff's prospective employer that Plaintiff had a criminal record in St. Louis City County, Missouri. Defendant's reporting was grossly inaccurate.

4. Plaintiff's prospective employer denied Plaintiff's job application after receiving an employment background check report from Defendant, which included the inaccurately portrayed criminal record.

5. Defendant's inaccurate reporting could have easily been avoided had Defendant reviewed the widely available underlying public court records from St. Louis City County, Missouri, prior to publishing the inaccurate information in Plaintiff's report and selling it to Plaintiff's prospective employer.

6. Defendant does not employ reasonable procedures to assure the maximum possible accuracy of the information it reports regarding consumers. Defendant's failure to employ reasonable procedures resulted in Plaintiff's report being grossly inaccurate.

7. Defendant committed these violations pursuant to its standard policies and practices, which harm innocent consumers seeking employment by prejudicing their prospective employers with inaccurate criminal record information.

8. Defendant's inaccurate report significantly delayed Plaintiff's employment and ability to earn income, and subsequently caused his employment to be denied altogether.

9. As a result of Defendant's violations of the FCRA, Plaintiff has suffered a range of actual damages including, without limitation, delayed employment; lost wages and benefits; loss of time and money trying to correct his background check report; damage to his reputation; loss of sleep; loss of capacity for enjoyment of life; and emotional distress, including mental anguish, anxiety, fear, frustration, humiliation, embarrassment, and sleepless nights.

10. As a result of Defendant's conduct, action, and inaction, Plaintiff brings claims against Defendant for failing to follow reasonable procedures to assure maximum possible accuracy based on 15 U.S.C. § 1681e(b) of the FCRA.

## PARTIES

11. Plaintiff is a natural person residing in Allen, Texas, and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

12. HireRight is registered to do business in the State of Michigan, maintains its principal place of business at 14002 East 21st Street, Suite 1200, Tulsa, Oklahoma 74134, regularly conducts business in this judicial district, and can be served with process by way of its registered agent, LegalInc Corporate Services, Inc., 624 South Denver Avenue, Suite 300A, Tulsa Oklahoma 74119.

13. Among other things, Defendant sells background checks to employers for their use in deciding whether to offer employment to prospective employees or to take adverse action such as termination, failure to hire, or failure to promote. These reports are provided in connection with a business transaction initiated by the employer.

14. HireRight is a "consumer reporting agency" as that term is defined under 15 U.S.C. § 1681a(f). HireRight assembles and merges information contained in the database of another consumer reporting agency and maintains a database of the assembled or merged information from which new consumer reports are produced.

15. Defendant is a consumer reporting agency as defined in 15 U.S.C. § 1681a(f) because for monetary fees, it regularly engages in the practice of evaluating and/or assembling information on consumers for the purpose of furnishing consumer reports for employment

purposes to third parties, and uses interstate commerce, including the Internet, for the purpose of preparing and furnishing such consumer reports.

## JURISDICTION AND VENUE

16. This Court has jurisdiction over Plaintiffs claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p, which allows claims under the FCRA to be brought in any appropriate court of competent jurisdiction.

17. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## STATUTORY BACKGROUND

18. Enacted in 1970, the FCRA's passage was driven in part by two related concerns: first, that consumer reports were playing a central role in people's lives at crucial moments, such as when they applied for a job or credit, and when they applied for housing.  Second, despite their importance, consumer reports were unregulated and had widespread errors and inaccuracies.

19. While recognizing that consumer reports play an important role in the economy, Congress wanted consumer reports to be "fair and equitable to the consumer" and to ensure "the confidentiality, accuracy, relevancy, and proper utilization" of consumer reports.  15 U.S.C. § 1681.

20. Congress, concerned about inaccuracies in consumer reports, specifically required consumer reporting agencies to follow "reasonable procedures to assure maximum possible accuracy" in consumer reports. 15 U.S.C. § 1681e(b).

21. Consumer reports that contain factually incorrect information which does not belong to the consumer at issue are neither maximally accurate nor fair to the consumers who are the subjects of such reports.

## THE FCRA'S PROTECTIONS FOR JOB APPLICANTS

22. Despite its name, the Fair Credit Reporting Act covers more than just credit reporting, it also regulates employment background check reports like the one Defendant prepared in Plaintiff's name.

23. The FCRA provides a number of protections for job applicants who are the subject of background checks for purposes of securing employment, housing, and other purposes.

24. In the parlance of the FCRA, background checks are "consumer reports," and providers of background checks, like Defendant, are "consumer reporting agencies." 15 U.S.C. §§ 1681a(d) and (f).

25. The FCRA imposes duties on consumer reporting agencies to assure that consumer reports are accurate and that "consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy." 15 U.S.C. § 1681.

26. Under 15 U.S.C. § 1681e(b), consumer reporting agencies are required "to follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

27. Defendant disregarded its duties under the FCRA with respect to Plaintiff's background check report.

## DEFENDANT'S ILLEGAL BUSINESS PRACTICES

28. Over the past 15 years, there has been increased collection and aggregation of consumer data, including criminal records and sex offender registration data. As a result of the increasing availability of this data, there has been a boom in the background check industry.

5

29. As summarized in a recent report by the Consumer Financial Protection Bureau[1], a 2018 survey of employers found that 95 percent of employers surveyed conducted one or more types of background screening. CFPB Report at 4.

30. The criminal background check industry takes in revenues in excess of three billion dollars, annually.[2]

31. Criminal background checks are generally created by running automated searches through giant databases of aggregated criminal record data. The reports are created and disseminated with little to no manual, in-person review, and the underlying court records are rarely directly reviewed in creating criminal background checks.

32. Background check companies, like Defendant, collect millions of criminal records from a number of sources with data from county, state, and federal level sources. The data included on the reports is often not obtained directly from court records on an individual basis but instead is purchased in bulk or scraped from court websites.

33. Given that Defendant is in the business of selling background checks, Defendant should be well aware of the FCRA and the attendant harm to consumers for reporting inaccurate or outdated information.

34. Defendant places its business interests above the rights of consumers and reports such inaccurate information because it is cheaper for Defendant to produce reports containing information that is inaccurate and incomplete than it is for Defendant to exert proper quality control over the reports prior to their being provided to Defendant's customers.

---

[1] CFPB, Market Snapshot: Background Screening Reports (Oct. 2019), https://fiels.consumerfinance.gov/f/documents/201909_cfpb_market-snapsho-background-screening_report.pdf ("CFPB Report").
[2] IBISWorld, Inc., *Background Check Services in the US: Report Snapshot*, available at http://www.ibisworld.com/industry/background-check-services.html.

35. Defendant reports such erroneous and incomplete information because it wants to maximize the automation of its report creation process, thereby saving the costs associated with conducting the additional review necessary to remove the inaccurate or out-of-date entries.

36. Defendant charges its customers the same price for reports that are grossly inaccurate as it does for accurate reports.

37. An appropriate quality control review of Plaintiff's report would have made clear that Defendant was reporting an expunged record.

38. As a provider of background check reports, Defendant should be aware of the FCRA requirements and is an accredited member of the Professional Background Screening Association ("PBSA"). PBSA hosts a conference at least once a year where presenters discuss compliance with federal and state consumer reporting laws.

## FACTS

**A. Defendant Inaccurately Reports a Criminal Record in January 2022**

39. Plaintiff has been working in the telecommunications industry, and specifically with respect to infrastructure, implementation, and Test and Turn Up, for some 35 years.

40. In or around January 2022, Plaintiff applied for a full-time telecommunications job with Northcentral Telcom, Inc. ("NCT").

41. NCT acts as the direct employer of employees who are contracted out to other companies for long-term work. In this particular instance, Plaintiff applied for an NCT position that would cause him to be partnered with Ciena, a multi-billion-dollar global telecommunications company based out of Maryland.

42. Plaintiff's experience and accomplishments in the industry impressed NCT, and on January 25, 2022, NCT emailed Plaintiff and extended a job offer.

43. The NCT offer, according to the NCT-emailed offer, would provide compensation in the amount of $2,2000 per week, along with generous substantial benefits, including a 401K plan with 50% employer matching, a substantial payment towards life insurance, PTO, and company holidays, along with a host of other optional benefits.

44. The NCT job offer was subject to Plaintiff's successfully passing a background check.

45. Accordingly, in or around January 2022, NCT purchased from HireRight a background report concerning Plaintiff ("HireRight Report").

46. The HireRight Report inaccurately and erroneously contained a criminal record, Case No. 1122CR0478901, in Saint Louis City County, Missouri (the "Criminal Record") that had been expunged in 2017 and no longer existed as a court record.

47. As a result of reviewing the HireRight Report, NCT informed Plaintiff that he was ineligible to begin work for NCT.

48. In the subsequent days, Plaintiff pleaded with NCT and provided documentary evidence showing that the criminal record should not have been included in the HireRight Report.

49. Plaintiff worked tirelessly to persuade NCT that the Criminal Record should not have been included in the HireRight Report.

50. Ultimately, NCT relented and allowed Plaintiff to begin work for NCT.

51. However, due to the inaccurate inclusion of the Criminal Record in the HireRight Report, and the necessary subsequent efforts undertaken by Plaintiff to persuade NCT to disregard HireRight's reporting of the Criminal Record, Plaintiff began working for NCT approximately three weeks later, in mid-February 2022.

52. Put simply, because of HireRight's inaccurate reporting, Plaintiff lost approximately three weeks of lost wages and benefits.

53. Additionally, because of HireRight's inaccurate reporting, Plaintiff suffered significant emotional distress and humiliation, and feared that he would lose the very generous job offer that NCT had extended.

54. Had Defendant actually consulted or obtained the widely available underlying public court records regarding the Criminal Record, it would not have published the Criminal Record to Plaintiff's prospective employer.

55. The sole reason the inaccurate Criminal Record were published to NCT was that Defendant failed to follow reasonable procedures to assure the maximum possible accuracy of the information it published within the employment report it sold about Plaintiff to Plaintiff's prospective employer.

56. In preparing and selling a consumer report about Plaintiff, wherein Defendant published to Plaintiff's prospective employer inaccurate information about Plaintiff, Defendant failed to follow reasonable procedures to assure that the report was as accurate as maximally possible, in violation of 15 U.S.C. § 1681e(b).

**B. Defendant Inaccurately Reports a Criminal Record in October 2022**

57. In or around September 2022, Plaintiff noticed that Avacend was hiring. Similar to NCT, Avacend acts as the direct employer of employees who are then contracted out to other telecommunications companies for long-term work.

58. In this particular instance, Plaintiff applied for an Avacend position that would cause him to be partnered with Fujitsu Network Communications, Inc., a multi-billion-dollar global leader in the telecommunications space.

59. In addition to generous benefits, the Avacend position offered compensation of $65 dollars per hour, which amounts to $2,600 per week without overtime, and Plaintiff anticipated substantial opportunities for earning still more.

60. Additionally, the Avacend position promised to be a stable, long-term position with immediate potential for growth.

61. Further, upon information and belief, the Avacend position was related to a government contract, which offered near-permanent job security.

62. Thus, the Avacend job was far more attractive and better suited to Plaintiff's needs and, accordingly, in or around September 2022, Plaintiff applied for the Avacend position.

63. On or about September 23, 2022, Plaintiff was hired by Avacend, and Plaintiff signed a Subcontracting Agreement and Work Order Agreement with Avacend.

64. Thereafter, towards the end of September 2022, Plaintiff submitted to NCT his two-week termination notice.

65. The Avacend job offer was subject to Plaintiff's successfully passing a background check.

66. Accordingly, in or around October 2022, Avacend purchased from HireRight a background report concerning Plaintiff (the "October HireRight Report").

67. The October HireRight Report inaccurately and erroneously, once again, contained Criminal Record that had been expunged in 2017 and no longer existed as a court record.

68. As a result of reviewing the October HireRight Report, Avacend informed Plaintiff that, based on the October HireRight Report, Plaintiff would be ineligible to begin work for Avacend.

69. In the subsequent days, Plaintiff pleaded with Avacend and provided documentary evidence showing that the Criminal Record should not have been included in the October HireRight Report.

70. In the subsequent days, on or about October 6, 2022, Plaintiff submitted a dispute to HireRight in which he indicated that the Criminal Record had been expunged.

71. In response, on or about October 25, 2022, Plaintiff received a letter from HireRight indicating results of a purported "completed investigation."

72. In the same letter, HireRight indicated that it had confirmed that, indeed, the Criminal Record "is no longer publicly available," and, as such, had "removed the case from the background report."

73. One day later, on or about October 26, 2022, Plaintiff received a letter from Avacend stating that its job offer had been rescinded because Plaintiff "did not meet the pre-employment screening" requirements.

74. Upon information and belief, on or about October 26, 2022, HireRight provided a background report concerning Plaintiff to Avacend, which report contained an additional criminal record, Case No. 002-82292-2022, occurring in Collin County, Texas (the "Texas Record").

75. Upon information and belief, HireRight's background report that contained the Texas Record included an indication that the Texas Record was still "pending" and not yet resolved.

76. However, the Texas Record had already been dismissed.

77. Therefore, it was inaccurate and materially misleading for HireRight to publish and indicate to Avacend that the Texas Record, a misdemeanor, had not been dismissed.

78. On or about October 26, 2022, Plaintiff submitted an additional dispute to HireRight concerning the inaccuracy in its indication that the Texas Record had not been dismissed.

79. On or about November 2, 2022, HireRight responded to Plaintiff's dispute and indicated that it would correct its inaccurate reporting of the Texas Record, and further indicated that it would remove the Criminal Record.

80. Relying on the HireRight letter that informed regarding the removal of the Criminal Record and the resolution of the Texas Record, Plaintiff immediately contacted Jim Wharton, an Avacend-related hiring manager, and excitedly informed him that HireRight had finally removed the Criminal Record from his background report and requested that he now be hired.

81. However, to Plaintiff utter dismay, Jim Wharton advised Plaintiff that the position had already been filled and was no longer available.

82. Plaintiff was devastated by the news that he had completely lost the opportunity to secure the Avacend position.

83. Plaintiff specifically resigned from his prior position with NCT once he was confident that he would secure the position with Avacend, because he had anticipated starting the job with Avacend without issue or delay.

84. Indeed, after Plaintiff had lost the Avacend opportunity, Plaintiff attempted, despite the dep humiliation and embarrassment, to return and work for NCT once again.

85. However, NCT informed him that his prior job had already been filled.

86. Thus, Plaintiff was left stranded and without a decent job.

87. Plaintiff's quality of life took a significant turn for the worse, and Plaintiff suffered the humiliation, shame, and embarrassment of being essentially unemployed.

88. Plaintiff tried driving for Uber and Lyft to make ends meet, but those odd jobs could not afford Plaintiff with anything near his prior living standard, and Plaintiff additionally began to fall behind on his financial obligations.

89. Further, Plaintiff was forced to use his own vehicle for Uber and Lyft, which driving caused his vehicle to accumulate significant mileage and ultimately devalued and depreciated his vehicle.

90. Because of Plaintiff's dire financial circumstances, which was a result of being denied the Avacend job, Plaintiff was forced to sell his prized motorcycle for significantly less than its true market value in a desperate effort to secure immediate and necessary funds.

91. Further, Defendant's egregiously inaccurate reporting and Defendant's loss of the Avacend job became a source of tension and strife in Plaintiff's romantic life and his relationship with his fiancé.

92. Plaintiff has worked in the telecommunications industry for approximately 35 years, and his inability to work in that industry has caused Plaintiff disorientation and mental pain.

93. The injuries suffered by Plaintiff as a direct result of Defendant's erroneous reporting are the type of injuries that the FCRA was enacted to address. Under common law, Defendant's conduct would have given rise to causes of action based on defamation and invasion of privacy.

94. As a result of Defendant's violations of the FCRA, Plaintiff has suffered a range of actual damages including, without limitation, loss of employment opportunities, wages, and benefits; loss of economic opportunities and positions and advancements in the future; loss of time and money trying to correct his background check report; damage to his reputation; loss of sleep;

loss of capacity for enjoyment of life; and emotional distress, including mental anguish, anxiety, fear, frustration, humiliation, and embarrassment.

## CLAIMS FOR RELIEF

### COUNT I
### 15 U.S.C. § 1681e(b)
### Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy

95. Plaintiff re-alleges and incorporates by reference the allegations set forth in the preceding paragraphs as if fully stated herein.

96. Defendant is a "consumer reporting agency" as defined by 15 U.S.C. § 1681a(f).

97. At all times pertinent hereto, Plaintiff was a "consumer" as that term is defined by 15 U.S.C. § 1681a(c).

98. At all times pertinent hereto, the above-mentioned employment report was a "consumer report" as that term is defined by 15 U.S.C. § 1681a(d).

99. Defendant violated 15 U.S.C. § 1681e(b) by failing to establish or to "follow reasonable procedures to assure maximum possible accuracy" in the preparation of the employment report it sold about Plaintiff as well as the information it published within the same.

100. As a result of Defendant's violations of the FCRA, Plaintiff has suffered a range of actual damages including, without limitation, delayed employment; lost wages and benefits; loss of time and money trying to correct his background check report; damage to his reputation; loss of sleep; loss of capacity for enjoyment of life; and emotional distress, including mental anguish, anxiety, fear, frustration, humiliation, and embarrassment.

101. Defendant willfully violated 15 U.S.C. § 1681e(b) in that its conduct, actions, and inactions were willful, rendering them liable for actual or statutory damages, and punitive damages

in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.  Alternatively, they were negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

102. Plaintiff is entitled to recover statutory damages, punitive damages, and reasonable attorneys' fees and costs from Defendant in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## TRIAL BY JURY

103. Plaintiff is entitled to and hereby demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for the following relief:

a) Determining that Defendant negligently and/or willfully violated the FCRA;

b) Awarding Plaintiff actual, statutory, and punitive damages as provided by the FCRA;

c) Awarding Plaintiff reasonable attorneys' fees and costs as provided by the FCRA; and,

d) Granting further relief, in law or equity, as this Court may deem appropriate and just.

Respectfully submitted this 27th day of January 2023.

*/s/ Kendra Penningroth*
Kendra Penningroth
**THE CONSUMER JUSTICE LAW FIRM**
8245 N. 85th Way
Scottsdale, AZ 85258
T: (480) 626-1447
E: kpenningroth@cjl.law

*Attorneys for Plaintiff Kevin McCall*